[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage
It is found that all of the allegations of the first count of plaintiff's amended complaint have been proven, CT Page 11056 that the marriage has broken down irretrievably and the marriage is ordered dissolved for that reason.
II. The Marital Estate of the Parties
Plaintiff (Wife)
 1990 Jeep Cherokee — Value $14,000 — Loan Balance $9946 equity $4054
Personal Property — Stuffed Animals $ 3,000
Bank Accounts 216
Merrill Lynch C.M.A. Total $3,676 1/2 1,838
McDonald Stock —
Merrill Lynch-Personal Injury Award 5,000
Antique Chippendale Dresser 6,500
Total $16,554
Defendant (Husband)
 1993 Ford Ranger Value $12,500 Loan Balance $10,000 Equity $2,500*
1986 Volkswagen Jetta Value $2,950*
Personal Property — Baseball Cards $ 3,000
Merrill Lynch (Keogh) 6,861
Merrill Lynch (I.R.A.) 16,883
Merrill Lynch C.M.A. 1/2 1,838
Merrill Lynch C.M.A. 1
 Shawmut-Property Acct. Joint with — C. J. Brojan — $3,078 Not a marital asset
CT Page 11057
Banner Lodge unpaid commission*
 Guardian Acct. for son, Tyler $27,952 Not a marital asset _________ $28,533
Total Marital Estate $45,087
III. The Evaluation of the Evidence in Accordance with the Provisions of Sec. 46b-81c, C.G.S.
The plaintiff wife, who is 44 years of age, and the defendant husband, who is 47, were married on September 8, 1973, twenty years ago. They have three children — a daughter Carey, age 18, a daughter Chase, age 17 and a son Tyler, age 15.
Plaintiff obtained a B.S. degree in sociology from the University of Massachusetts in 1972. She is not in the best of health, partly as a result of an automobile accident in 1987 wherein she injured her left shoulder and neck. In her words, "The knot in my shoulder never goes away. I can't do waitressing or work at a keyboard." She is presently taking several medications including Xanex for anxiety, Motrin for her disabled shoulder, and an anti-depressant.
Defendant obtained a B.S. degree in business from The College of William and Mary in 1969. He states himself to be and appears to be in good health.
The parties first met during the Christmas holiday season in 1972 after plaintiff had returned from Hawaii. At that time defendant had two jobs, being involved in real estate sales during the day and serving as a waiter and bartender at Chuck's Steak House in Farmington during the evenings. The parties married the following September. At that time plaintiff's estate consisted of $500 in savings, a Ford Mustang, and a $5,000 student loan debt. Defendant testified that he had about $10,000 in savings at that time. CT Page 11058
After the marriage and the births of their children, plaintiff's activities centered upon the home. In defendant's words, "She was the taxi." She took the children to various and sundry athletic events and otherwise acted as a housewife and homemaker. In 1983-84, when the children were all in school, she did part-time work as a baby-sitter. When defendant suggested she seek full time employment her response was, "I want to be there when the kids get off the school bus." At the present time plaintiff is working as an independent contractor doing wellpapering [wallpapering] and calligraphy. Her current financial affidavit reflects a gross weekly income from her employment of $58 with a net after the usual deductions of $50 weekly.
Defendant abandoned his second job as a waiter and bartender in 1974 but continued his employment in the real estate field with an added avocation of soccer referee from which he derived $80 per game. Through the fortunate combination of an attractive personality and his skill as a salesman, defendant did well in his employment. He was not so successful in the investment of the fruits of his labor. From 1978 to 1981 he was the local manager at Heritage Realty and thereafter, until 1984, was similarly employed at Merrill Lynch Realty. In 1988 he went into business for himself, and in June 1989, facing a declining real estate market, returned to Prudential Real Estate in Glastonbury where he presently serves as a realtor associate. He describes the present business climate as follows: "The business is doing well — we're working harder." The manager of this office described him as "one of our better producers." In both 1992 and 1993 he received awards for his record number of sales. His current financial affidavit indicates a gross weekly income from his employment of $1,397 with a net after deductions of $747. He has an additional weekly net income of $80 from his officiating at soccer games, providing him a total net weekly income of $827.
The parties have purchased five different homes during their time together, each more expensive than its predecessor. They also acquired an impressive summer home at Groton Long Point on the Connecticut shore. Their last dwelling, an extended structure containing several rental CT Page 11059 units, was bought in 1990 for $650,000, being partially financed with a mortgage on the property in the amount of $450,000.
At this point the declining real estate market brought an end to defendant's success in the acquisition of real estate. The first to go was their summer home, purchased for $375,000 in 1987 and sold in June 1993 for $281,500. The last and most financially disastrous event was the foreclosure of their family home on October 2, 1993 with a resulting deficiency judgment against the parties of about $92,000.
The two daughters of the parties have given them a number of problems. Carey, 18, is hyperactive with a small attention span. She attended Kingswood Oxford School for one year, received fair grades and was requested not to return. She later attended and graduated from Glastonbury High School. In 1991 she was briefly a patient at Mount Sinai Hospital where she was treated for emotional problems. She is presently attending Manchester Community College and is living with friends. Plaintiff described her as violent, verbally abusive and out of control.
Chase, 17, attended Glastonbury High School for one year, then transferred to Suffield Academy for her second year. At its completion she too was asked not to return, and spent her third year at the Institute of Living. She has now returned to Glastonbury High where her present grades are said to be "not very good." Chase is presently residing with her father. Both daughters have received the personal attention of the Glastonbury Police Department.
Tyler, 15, the youngest child of the parties, is a sophomore at Loomis Chaffee School. He is a good student and is very much involved in soccer where plaintiff has described him as "ranked regionally as one of the best goalies in the state." Tyler resides with the plaintiff who has expended part of the funds obtained by her from her accident settlement toward Tyler's school tuition.
Fault
During this trial there was no evidence of physical abuse, infidelity or the use of alcohol or drugs by either CT Page 11060 party. It is the court's observation that most of the family disputes resulted at least indirectly from problems with the children or with family finances.
In the court's review of the testimony of the parties, the following comments of plaintiff on the subject of fault are noted: "He was verbally abusive to me. When the children were young he wasn't involved at all with them. I was the sole caretaker. He wanted the home immaculate. He'd leave me lots of things to accomplish. It seemed that I never did anything right. I went alone on the ski vacations. He didn't go to any of the children's games until they were twelve. He would announce in front of the children that we were getting a divorce. This would upset them for the rest of the day. He would call me stupid, boring, a plain Jane. If I went to a party he'd criticize my speech. I am not a great cook. This was always a pressure item for me. If the guests didn't have a glass, he'd say I didn't do my job. I finally stopped having parties — it wasn't worth it. He'd say `I'll cut off the money if you don't do things right.' I suggested counseling. He went once, but he wouldn't go back." Since early 1993 plaintiff has been attending support group sessions at Interval House, a facility providing assistance for those who have received verbal as well as physical abuse.
For his part, defendant offered the following testimony as the reasons for the breakdown of the marriage. "We share a different philosophy. We couldn't agree on major financial decisions. A domino effect was created in our financial affairs. We differed on how to deal with the children. She had them involved in gymnastics, soccer and swimming all in one day — they never had any down time. We lived our lives on the run. The problems increased as the children got older. The last straw was when she wanted Carey to remain at Mount Sinai Hospital where Carey had told me she was unhappy. I had her removed after seven or eight days. She lost no credits and finished out the year at school." On the subject of their home life together and with the children, defendant stated, "I had flexible time which I spent at home with the children. I did all the exterior maintenance on the house and some inside. I vacuumed, cleaned the bathroom, did the dishes. She construed anything I said as criticism. If I spoke about CT Page 11061 her makeup she'd take it totally the wrong way. She had free run as to what to do during the day. We went on vacations both alone and with the children." On the subject of money, he stated, "When I look at the checkbook and see the expenses I'd get concerned. My children have had the best of everything for a long time." On the subject of verbal abuse, he added, "I've used vulgar words to her but never abusive language."
After sifting through and weighing all of the evidence on this issue, it is found that responsibility for the irretrievable breakdown of the marriage should be shared equally by the parties.
Other Factors
Defendant has a greater opportunity than does plaintiff for the future acquisition of capital assets and income.
The parties have contributed equally, each in his or her own way, to the acquisition, preservation or appreciation in value of their respective estates.
Conclusion
After having considered all of the factors set forth in Section 46b-81c C.G.S. and after having given particular attention to such predominating factors as the length of the marriage, the comparative state of health of the parties, the amount and sources of their income, and the relative opportunities of each for the future acquisition of capital assets and income, this court orders that the marital estate of the parties be distributed as follows:
Plaintiff 58%
Defendant 42%
IV. The Distribution of the Marital Estate in Accordance with the Finding Made in Article III (supra)
 Total Estate on hand for distribution $45,087 58% interest of plaintiff 26,150 42% interest of defendant 18,937
CT Page 11062
Plaintiff's amended sole title to the following:
 1990 Jeep Cherokee — as per stipulation — Banner Lodge unpaid commission 1/2 as — per stipulation
 Personal Property — stuffed animals 3,000 Bank accounts 216 Merrill Lynch C.M.A. 3,676 McDonald stock — Merrill Lynch — personal injury award 5,000 Freezer, wallpapering supplies, beach gear, holiday decorations, title from Groton Guardian account for son, Tyler $27,952 Amount due from defendant 14,258 Total $26,150
Defendant is awarded sole title to the following:
 1993 Ford Ranger — as per stipulation 1986 Volkswagen Jetta — as per stipulation Banner Lodge — as per stipulation — unpaid commission — 1/2 Merrill Lynch (Keogh) 6,861 Merrill Lynch (I.R.A.) 16,833 Merrill Lynch C.M.A. 1 Shawmut Property Acct. #3078 — Garden tools, riding lawnmower — Antique Chippendale Dresser 6,500 Personal Property — Baseball cards 3,000 Total $33,195
 Less amount due plaintiff 14,258 Total due defendant $18,937
 V. Supplemental Orders Relating to the Distribution Ordered in Article IV
A. Said sum of $18,937 shall be due and payable to the plaintiff within 30 days from date thereof and shall otherwise bear interest at the rate of 8% per annum until paid. CT Page 11063
B. Each party shall execute all documents necessary to carry out the orders of this court.
VI. Alimony
After reviewing all the evidence as it relates to Section 46b-82 C.G.S., this court orders as follows:
Defendant shall pay plaintiff as alimony the sum of $300 per week for a period of four years, the sum of $200 per week for a period of four years thereafter, and the sum of $100 per week for a final period of two years.
This order shall be nonmodifiable as to term only, and shall sooner terminate upon the remarriage of the plaintiff, her cohabitation with an unrelated male within the meaning of the Statute, or the death of either party.
During such time as defendant is required to pay alimony, the parties shall annually, commencing April 15, 1994, exchange federal income tax returns.
It is the intent of this order to provide plaintiff with the means necessary to improve upon her skills acquired both while in college and during the course of her employment thereafter and, through a relatively slow process of easing her reentry into the market place, to furnish her the opportunity with reasonable effort to enjoy financial success commensurate with her ability in her chosen field of endeavor.
VII. Orders Concerning the Minor Children
A. CUSTODY AND CHILD ACCESS
The plaintiff shall have sole legal custody of the minor child, Tyler, and Tyler shall reside with the plaintiff. The defendant shall have sole legal custody of the minor child, Chase, and Chase shall reside with the defendant.
The parties agree that clear custodial arrangements are in the best interests of Tyler and Chase. Accordingly, the party with sole custody shall have the right to make all major decisions related to that child. CT Page 11064 Day-to-day decisions shall be made by the parent with whom the child visits or resides at the time.
Each party shall keep the other informed regarding the general welfare of any child in the custody of or residing with him or her, and shall authorize the other to receive reports directly from any third party professional attending or school enrolling a child residing with him or her. Each party will promptly notify the other of any medical or academic problems or other pressing issues regarding a child residing with him or her.
Each party shall notify the other of any intended move at least thirty (30) days in advance of such move, and shall provide the other with addresses and telephone numbers so long as there is any minor child of the marriage.
Notwithstanding the foregoing, the parties shall make joint decisions as to Chase's evaluation and treatment for behavioral problems, psychological problems and/or substance abuse, and evaluation and remedial work for academic problems.
B. VISITATION
Each parent shall have reasonable and flexible rights of visitation with the child(ren) residing with the other parent upon reasonable advance notice.
C. SUPPORT
The defendant is ordered to pay plaintiff as support for the minor child, Tyler, the sum of $135 per week.
A contingent wage garnishment may issue.
D. HEALTH INSURANCE
Plaintiff shall continue the existing independent health and dental insurance for the benefit of herself, Tyler, and Chase. If there is an additional cost to plaintiff for maintaining Chase on said coverage, defendant shall assume said cost. Otherwise, plaintiff shall be CT Page 11065 responsible for the payment of health insurance premiums and shall hold the defendant harmless therefrom.
Connecticut General Statute 46b-84(c) shall apply.
Each party shall share equally in the unreimbursed health, dental, orthodontic, prescriptive, psychiatric and related medical expenses for the minor children.
E. LIFE INSURANCE
This court notes that no life insurance is indicated on defendant's financial affidavit, and that no evidence has been submitted as to its cost or to his insurability. For these reasons no order is made on this subject. See Michel v. Michel, 21 C.A. 338 (1993).
F. TAX EXEMPTIONS
The plaintiff shall be entitled to the minor son, Tyler, as an exemption on her federal and state income tax returns, and defendant shall take the minor daughter, Chase, on his returns.
VII. Other Orders
Because of the orders previously made, this court makes no award of counsel fees to plaintiff.
B. Liabilities
1. The parties shall be equally responsible for any deficiency judgment resulting from the foreclosure of any mortgage on their home on Main Street, Glastonbury, Connecticut.
2. With regard to past joint income tax returns of the parties, each party shall pay any taxes, interest or penalties related to his or her own declaration of income and deductions, and shall hold the other party harmless therefrom.
3. Defendant shall be solely responsible for any tuition due to Kingswood Oxford School, for any unreimbursed outstanding medical expenses related to the CT Page 11066 children, including Carey's hospitalization in 1993, for any amount due Attorney T. Witherspoon, and for all other debts listed on Schedule A of his financial affidavit dated November 4, 1993, and shall hold plaintiff harmless therefrom.
4. Plaintiff shall be solely responsible for and shall hold defendant harmless from all debts listed on Schedule C of her proposed orders dated November 11, 1993 excepting such debts as have been otherwise dealt with above.
C. Arrearages of Alimony or Support
Orders of alimony or support entered herewith shall not extinguish any arrearage which may exist by virtue of any pendente lite order of this court.
BY THE COURT
John D. Brennan State Judge Referee